NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**APPLE INC., FACEBOOK, INC., WHATSAPP, INC.,**
*Appellants*

**v.**

**UNILOC 2017 LLC,**
*Cross-Appellant*

---

2019-1151, 2019-1179, 2019-1203

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2017-00222, IPR2017-01635.

---

Decided:  February 9, 2021

---

LAUREN B. FLETCHER, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, for appellant Apple Inc.  Also represented by HEATH BROOKS, Washington, DC; S. CALVIN WALDEN, New York, NY.

HEIDI LYN KEEFE, Cooley LLP, Palo Alto, CA, for appellants Facebook, Inc., WhatsApp, Inc.  Also represented by LOWELL D. MEAD, MARK R. WEINSTEIN; PHILLIP EDWARD MORTON, Washington, DC.

2                                          APPLE INC. v. UNILOC 2017 LLC

JAMES ETHERIDGE, Etheridge Law Group, Southlake, TX, for cross-appellant.   Also represented by RYAN S. LOVELESS, BRETT MANGRUM, JEFFREY A. STEPHENS.

_____

Before LOURIE, WALLACH, and CHEN, *Circuit Judges*.

LOURIE, *Circuit Judge*.

Apple Inc. ("Apple") petitioned for *inter partes* review of U.S. Patent 8,243,723 ("the '723 patent"), owned by Uniloc Luxembourg S.A. ("Uniloc").  The United States Patent and Trademark Office Patent Trial and Appeal Board ("the Board") held that claims 1 and 2 of the '723 patent would have been obvious over the prior art but that Apple failed to demonstrate by a preponderance of the evidence that claims 3–8 would have been obvious.  *See Apple Inc. v. Uniloc Luxembourg S.A.*, No. IPR2017-00222, 2018 WL 2355988 (P.T.A.B. May 23, 2018) ("*Decision*").  Apple appeals the Board's holding that it failed to demonstrate unpatentability of claims 3–8, and Uniloc cross-appeals the Board's holding that claims 1 and 2 would have been obvious.  We *affirm* the Board's decision in all respects.

BACKGROUND

Uniloc owns the '723 patent, which is directed to systems and methods for delivering instant voice-over-IP ("VoIP") messages over the Internet.  Traditional telephony is based on a public switched telephone network ("PSTN").  '723 patent col. 1 ll. 20–21.  The patent acknowledges that voice messaging in both PSTN and VoIP as well as instant text messaging over an IP network were known.  *Id*. col. 2 ll. 18–30.  But the patent asserts that at the time of the invention there remained a need for instant VoIP messaging with PSTN support.  *Id*. col. 2 ll. 43–49.

The '723 patent purports to address this need by providing a local instant voice messaging ("IVM") system that includes an IVM server and one or more IVM clients,

such as VoIP telephones. *Id*. col. 6 ll. 48–55. The IVM server stores users that are known to the server, including IVM clients and legacy telephone clients. *Id*. col. 13 ll. 56–58. The server stores a record for each user, including a contact list that indicates other users with which the user wishes to exchange instant voice messages. *Id*. col. 13 ll. 58–62. The server also maintains a record of the connectivity status of each IVM client (*i.e.*, whether the client is connected to the IVM server and available to receive messages), *id*. col. 12 ll. 46–52, and facilitates the transmission of messages between clients, *id*. col. 7 ll. 59–61.

To initiate transmission of a voice message, an IVM client displays a user's contact list, and the user selects one or more IVM recipients to whom to transmit a voice message. *Id*. col. 7 ll. 61–67. "The user selection also generates a start signal to the IVM client that the user is ready to begin instant voice messaging." *Id*. col. 8 ll. 1–3. The patent discloses two modes of operation—a "record mode" and an "intercom mode." *Id*. col. 7 ll. 53–57. In record mode, in response to the start signal, the IVM client records the user's speech into a digitized audio file stored on the IVM client. *Id*. col. 8 ll. 3–7. If a recipient IVM client is connected to the IVM server, the audio file is immediately transmitted to the recipient client. *Id*. col. 8 ll. 28–30. If a recipient client is not connected to the server (*i.e.*, if the recipient client is "unavailable"), the audio file is temporarily stored on the server and transmitted to the recipient client when the client connects to the server. *Id*. col. 8 ll. 30–35.

Unlike record mode, according to the patent, intercom mode implements real-time instant voice messaging. In intercom mode, instead of recording the user's speech to an audio file, the IVM client uses one or more buffers to write and transmit successive portions of the user's speech to the IVM server. *Id*. col. 11 ll. 33–43.

Apple petitioned for *inter partes* review of claims 1–8 of the '723 patent. Claim 1 is the only independent claim at issue, with claims 2–8 depending directly or indirectly from claim 1. Claims 1, 3, and 8 are specifically relevant to this appeal and are reproduced below.

> 1. A method for instant voice messaging over a packet-switched network, the method comprising:
>
> monitoring a connectivity status of nodes within the packet-switched network, said connectivity status being available and unavailable;
>
> recording the connectivity status for each of the nodes;
>
> associating a sub-set of the nodes with a client;
>
> transmitting a signal to a client including a list of the recorded connectivity status for each of the nodes in the sub-set corresponding to the client;
>
> receiving an instant voice message having one or more recipients;
>
> delivering the instant voice message to the one or more recipients over a packet-switched network;
>
> temporarily storing the instant voice message if a recipient is unavailable; and
>
> delivering the stored instant voice message to the recipient once the recipient becomes available.

*Id*. col. 23 l. 56–col. 24 l. 16.

> 3. The method for instant voice messaging over a packet-switch network according to claim 1, further comprising the step of:
>
> controlling a method of generating the instant voice message based upon the connectivity status of said one or more recipient.

*Id*. col. 24 ll. 17–26.

> 8. The method for instant voice messaging over a packet-switch network according to claim 6, wherein said intercom mode comprises the steps of:
>
> buffering each of a plurality of successive portions of the instant voice as the instant voice message is recorded;
>
> transmitting from each successive buffered portion; and
>
> delivering each successive portion to the recipients wherein the recipients audibly playing each successive portion as it is delivered.

*Id*. col. 24 ll. 46–54.

Relevant to this appeal, Apple alleged that (1) claim 1 would have been obvious over U.S. Patent App. Pub. 2002/0146097 ("Vuori"), (2) claims 2–7 would have been obvious over Vuori in view of U.S. Patent App. Pub. 2003/0219104 ("Malik"), and (3) claim 8 would have been obvious over Vuori in view of Malik and U.S. Patent 6,192,395 ("Lerner").

Vuori discloses systems and methods for sending short voice messages ("SVMs") between mobile devices. To transmit an SVM, a user device records a message spoken by the user. Vuori ¶ 32. The user selects one or more recipients of the SVM, and the user device transmits the recorded message to an SVM service center ("SVMSC"), which determines the availability of the recipients. *Id*. ¶ 33–34. Vuori discloses an SVM presence service that accepts, stores, and distributes presence information among clients. *Id*. ¶ 43. Presence information can include a status indicating that a user is online (available), offline (unavailable), or other information. *Id*. ¶ 47. The SVMSC is able to check the availability of the recipient. *Id*. ¶ 50. If the recipient is available, the SVMSC sends the message

immediately; if the recipient is unavailable, it continues attempting to send the message until the recipient either becomes available or a time out occurs. *Id*. ¶ 50–51. In one embodiment, the recipient receives a notification of the received message, which the recipient can accept or reject. *Id*. ¶ 36. In another embodiment, the sender first determines whether the intended recipient is available by means of a presence service and whether the intended recipient has effectively acquiesced to availability by previously joining a "buddy list." If so, the recipient immediately receives the SVM. *Id*.

Malik discloses systems and methods for sending instant voice messages where clients receive and play voice messages received from other clients. Malik ¶ 25. Malik describes a voice instant message ("VIM") server that monitors presence information of clients. *Id*. ¶ 26. To initiate transmission of a voice message, a user speaks into a microphone of a client device, which generates a voice recording. *Id*. ¶ 33. The client then sends the voice recording to a server. *Id*. ¶ 36. If a recipient client is unavailable to receive the message, the message is stored in a queue and delivered when the recipient client connects to the network. *Id*.

Lerner discloses a method of visually identifying speaking participants in a multi-participant event, such as an audio conference. Lerner describes a sound control module that routes sound between participants using a plurality of buffers. Lerner col. 5 ll. 27–30. To transmit sound, a router breaks a signal in a transmit buffer into packets that are routed to the participants by a server. *Id*. col. 5 ll. 44–54. To receive sound from remote participants, the sound control module includes a plurality of receive sound buffers. *Id*. col. 5 ll. 30–34. The identity of the participant associated with each packet is used to route the packet to the appropriate receive sound buffer. *Id*. col. 5 ll. 37–40.

The Board instituted trial on all grounds and issued a final written decision concluding that Apple had demonstrated that claims 1 and 2 would have been obvious but failed to demonstrate by a preponderance of evidence that claims 3–8 would have been obvious. The Board first construed "list" as recited in claim 1. The Board agreed with Uniloc that the "list" must record the connectivity status of more than one node, reasoning that to conclude otherwise would ignore the recitation of recording a connectivity status for *each* of the nodes. *Decision*, 2018 WL 2355988, at *6. Applying its construction, the Board determined that Vuori's use of a buddy list and tracking of presence information of users discloses the claimed "transmitting a signal to a client including a list of the recorded connectivity status for each of the nodes in the sub-set corresponding to the client." *Id*. at *12.

With respect to claim 3—as well as claims 4–8, which depend directly or indirectly from claim 3—the Board rejected Apple's argument that both Vuori and Malik disclose "controlling a method of generating the instant voice message based upon the connectivity status of said one or more recipient." *Id*. at *16. Specifically, the Board found that both Vuori and Malik describe different methods for *sending* messages based on connectivity status but fail to disclose different modes of *generating* messages, as required by claim 3. *Id*.

Finally, with respect to claim 8, the Board noted that Apple had failed to demonstrate unpatentability based on claim 8's dependency from claim 3. *Id*. at *17. Nonetheless, the Board concluded that Apple had not demonstrated that Lerner discloses "buffering each of a plurality of successive portions of the instant voice as the instant voice message is recorded." *Id*. Specifically, the Board found that Lerner's receive sound buffers buffer packets as they are received by the recipient, not as the messages are recorded, *id*. at *18, and noted that Apple's petition did not rely on any other buffer in Lerner as disclosing the

buffering limitation, *id.* The Board denied requests for re-hearing from both parties. *See Apple Inc. v. Uniloc Luxembourg S.A.*, No. IPR2017-00222, 2018 WL 4263073 (P.T.A.B. Sep. 6, 2018); *Apple Inc. v. Uniloc Luxembourg S.A.*, No. IPR2017-00222, 2018 WL 4279645 (P.T.A.B. Sep. 6, 2018).

Apple appealed, and Uniloc cross-appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

Obviousness is a question of law that "lends itself to several basic factual inquiries," *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966) (citing *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 155 (1950)), including the scope and content of the prior art, the level of ordinary skill in the art, differences between the prior art and the claimed invention, and any relevant secondary considerations. *Id.* "We review the PTAB's factual findings for substantial evidence and its legal conclusions *de novo*." *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 449 (Fed. Cir. 2015) (citing *Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013)). A finding is supported by substantial evidence if a reasonable mind might accept the evidence as adequate to support the finding. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "If two 'inconsistent conclusions may reasonably be drawn from the evidence in record, the PTAB's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence.'" *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1356 (Fed. Cir. 2018) (quoting *In re Cree, Inc.*, 818 F.3d 694, 701 (Fed. Cir. 2016) (internal brackets omitted)).

## I. APPLE'S APPEAL

On appeal, Apple argues that the Board erred in implicitly construing claim 3 as requiring two modes of generating a voice message. Under a correct interpretation in

which claim 3 requires only one method of generating a voice message based on connectivity status, according to Apple, Malik discloses the additional limitation of claim 3. However, even under the Board's construction, Apple argues that the Board's conclusion that Malik fails to disclose the controlling limitation was unsupported by substantial evidence.

Apple also argues that the Board's conclusion that Lerner fails to disclose the buffering limitation of claim 8 was unsupported by substantial evidence. We address Apple's arguments in turn.

### 1. Claim 3

Claim 3 depends from claim 1 and further recites "controlling a method of generating the instant voice message based upon the connectivity status of said one or more recipient" (the "controlling limitation"). Apple argues that, although neither party sought construction of any element of claim 3 and the Board provided none, the Board in its obviousness analysis implicitly construed claim 3 "as requiring two modes of generating instant voice messages." Appellants' Br. 35. According to Apple, claim 3 does not require selecting a method of generating an instant voice message from more than one method, but requires only controlling "one method of generating the instant voice message based on connectivity status." *Id*. at 37.

Apple offers two explanations why Malik satisfies its proposed interpretation: first, because it discloses detecting whether the recipient is available before generating a voice recording, *id*. at 39–40 (citing Malik Fig. 4); second, because, in some embodiments, a user is given a choice whether to generate a voice message if the recipient is unavailable, while in other embodiments a voice message is generated regardless of the availability of the recipient. *Id*. at 41 (citing Malik ¶ 31). Even under the Board's alleged construction, Apple argues, Malik discloses the controlling limitation because it describes delivering messages

immediately if the recipient is available, while storing and delivering messages later if the recipient is unavailable. *Id.* at 42.

As an initial matter, we disagree with Apple that the Board engaged in implicit construction of claim 3 in its obviousness analysis. Rather, the Board made factual findings regarding the content of Malik's disclosure, and considered whether that content satisfied the claims. Apple points to a single statement as evidence of the Board's alleged implicit construction in which the Board found that Malik does not "control[] the 'generating' of the voice instant message because it is always generated in the same manner—recording mode." *Decision*, 2018 WL 2355988, at *16. Rather than engaging in implicit claim construction, the Board merely made a factual finding that, when Malik describes generating a voice instant message, the message is always generated by recording and storing the voice of the sender, akin to the recording mode of the '723 patent.

Whether asserted prior art discloses the claim limitations of a challenged patent is a factual question reviewed for substantial evidence, *see Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1575 (Fed. Cir. 1995), and we reject Apple's attempt to bootstrap its argument into one of claim construction in order to receive de novo review. *See also Graham*, 383 U.S. at 17–18 (establishing the "basic factual inquiries" underlying obviousness, including "the scope and content of the prior art" and the "differences between the prior art and the claims at issue"). Accordingly, we consider only whether the Board's determination that Malik fails to disclose the controlling limitation was supported by substantial evidence.

Apple offers three theories of how Malik discloses "controlling a method of generating the instant voice message based upon the connectivity status" of a recipient. First, in its petition, Apple argued that Malik discloses the controlling limitation because "when a client is online and

available, a client generates and sends messages in real time," while "when the recipient is not present and/or is not available online VIMs are recorded." J.A. 5032. The Board concluded that the cited portions of Malik describe "*sending* [messages], not *generating* them." *Decision*, 2018 WL 2355988, at *16.

We agree with the Board. Whether the message is delivered immediately or at a later time, the message is generated in the same manner—by a voice recording. *See* Malik ¶¶ 32–33 ("[I]n blocks 430-435, the VIM client 320 of the second user checks to see if the computing device of the VIM client 320 is capable of generating a voice recording."); ("[I]f the second user accepts the VIM invitation, then the VIM client 320 of the second user starts a voice recorder."); ("[T]he VIM client 320 of the second user generates a voice recording for the first user."). Because the voice message is generated in the same manner regardless whether its delivery is immediate or delayed, the method of generation cannot be said to be "controlled" based on connectivity status.

Apple suggests that, because Malik does not expressly state that a voice recording is generated in the same manner when the message is delivered immediately as when the message is stored and delivered later, Malik must disclose some other manner of generating voice message when it is delivered in real time. Appellants' Br. 44. To the extent that Apple argues that Malik's "real time" delivery inherently discloses that the voice message is generated in a different manner, we disagree. Apple, holding the burden of persuasion, presented no evidence that real time message delivery requires the voice message to be generated in a manner other than voice recording—the only method disclosed in Malik—and Malik provides no suggestion that generating the message by voice recording would be inadequate or incompatible with real time message delivery. "The mere fact that a certain thing may result from a given set of circumstances is not sufficient [to establish

inherency.]" *In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993) (quoting *In re Oelrich*, 666 F.2d 578, 581–82 (CCPA 1981)). Accordingly, based on the disclosure of Malik, we conclude that the Board's finding that the messages are generated by voice recording in both cases was supported by substantial evidence.

Second, Apple argues that Figure 4 of Malik (reproduced below) discloses the controlling limitation because it discloses detecting whether the recipient is available before generating a voice recording. Appellant Br. 39–40.



FIG. 4

We note that Apple did not advance this theory in its petition, and it cannot be raised for the first time on appeal. *See Wasica Finance GmbH v. Continental Automotive Sys., Inc.*, 853 F.3d 1272, 1286–87 (Fed. Cir. 2017).[1] In any

---

[1] Apple did not explicitly reference Figure 4 of Malik in its original petition, nor did it make nearly as comprehensive an argument regarding the disclosure of Figure 4 before the Board until it sought rehearing. See J.A. 5020–

event, we disagree with Apple. The fact that the determination of availability occurs before the generation of the voice message does not demonstrate that the method of generation is controlled by the connectivity status. In fact, because Figure 4 does not show any logical decision regarding generation at step 425—where availability is determined—the determination of availability cannot be said to exert control over any aspect of generating the voice message. Further, Malik explains, in the portion cited by Apple in its petition, that the only action in response to the determination in step 425 that the user is not present and/or available is that the "*sending* of the instant message" is not initiated. *See* Malik ¶ 32 (emphasis added). Accordingly, we disagree that Figure 4 demonstrates that the determination of connectivity status controls the method of *generating* the voice message, and we reject Apple's argument.

Third, Apple points to the disclosure in ¶ 31 of Malik that, in other embodiments, a voice message is generated "regardless of the presence and/or availability" of the recipient. Appellants' Br. 41 (quoting Malik ¶ 31). According to Apple, this demonstrates that, in the Figure 4 embodiment, "the voice instant message is generated based upon connectivity status." *Id.* at 42. As above, Apple did not present this theory in its petition, and we consider this argument forfeited. But as above, we also disagree with Apple's reading-through-negative-implication argument. Consistent with the Board's finding, when read in the full context of Malik's discussion of Figure 4, Malik describes only that the *sending* of the message is controlled by the connectivity

---

23. In its petition, Apple did point to a portion of the specification in Malik describing in part the embodiment in Figure 4; however, the discussion was limited to two sentences of Malik, which reference only blocks 425, 430, and 435. J.A. 5032.

status of the receiver, not the generating of that message. Accordingly, we reject this argument as well and affirm the Board's decision that Apple failed to demonstrate that claim 3 would have been obvious over the prior art.

### 2. *Claim 8*

Because we affirm the Board's conclusion that Apple failed to demonstrate that Malik discloses the controlling limitation of claim 3 and Apple does not dispute the Board's conclusion that Vuori fails to disclose the limitation, we affirm the Board's conclusion that Apple did not demonstrate that claim 8 would have been obvious based on claim 8's dependency from claim 3. Accordingly, we need not address Apple's argument that the Board erred in determining that Lerner does not disclose the buffering limitation of claim 8.

### II. UNILOC'S CROSS-APPEAL

In its cross-appeal, Uniloc argues that the Board erred in concluding that claims 1 and 2 would have been obvious over the prior art. Specifically, Uniloc argues that the Board's determination that Vuori discloses "transmitting a signal to a client including a list of the recorded connectivity status for each of the nodes in the sub-set corresponding to the client" as recited in claim 1 was unsupported by substantial evidence.

Uniloc makes two principal arguments. First, Uniloc argues that Vuori fails to disclose transmitting a single signal that includes a list of connectivity statuses for multiple users. Instead, according to Uniloc, the SVM presence service of Vuori distributes presence information one value at a time, rather than including multiple values in a single signal. Referring to Figure 7 (reproduced below), Uniloc asserts that Vuori describes that SVM watcher 256 requests either "the current value of some SVM presentity's presence information" or "notification from the SVM presence service 248 of (future) changes in some SVM

presentity's presence information." Cross-Appellant's Br. 22 (quoting Vuori ¶ 44). In either case, according to Uniloc, status information is distributed for only a single client device, rather than a list of statuses for multiple users.



FIG. 7

Apple responds that the Board's conclusion that the SVM presence service distributes presence information for multiple nodes in a single signal was supported by substantial evidence, and we agree. The Board considered the testimony of Uniloc's expert, William Easttom, that the SVM presence service "distributes presence information . . . one value at a time," but found that Uniloc's evidence was contradicted by other aspects of Vuori's disclosure. *Decision*, 2018 WL 2355988, at *14. Specifically, referring to Figure 10, the Board found that Vuori illustrates presence information comprising multiple "presence tuples," each with a status marker. *Id.* Vuori explains that "presence information comprises an arbitrary number of elements," and "[e]ach such element comprises a status marker." Vuori ¶ 47. Based on this disclosure, the Board determined that it was not reasonable to restrict Vuori's teaching to distributing only one status value at a time, as suggested by Easttom. It was within the Board's discretion to assess the credibility of Easttom's testimony, *see Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010) (citing *Velander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003)), and, based on Vuori's disclosure of the presence information as comprising multiple status markers, we cannot conclude that it was error

for the Board to determine that Vuori's transmission of presence information includes status information for multiple users.

Second, Uniloc argues that the Board erred in determining that Vuori discloses transmitting a signal *to a client*. Again referring to Figure 7, Uniloc argues that presence information is distributed only to SVM watcher 256, not to either of the "user agents" (*i.e.*, clients, denoted as 276 and 278). Apple responds that the Board's conclusion that a person of ordinary skill would understand that the presence information is transmitted to the user agents was supported by substantial evidence, relying on the testimony of its expert, Dr. Leonard Forys.

Before the Board, Uniloc presented the same argument, relying on Easttom's declaration that "SVM watcher 256 is not a user-facing 'client'" and, relying on the unidirectional arrows in Figure 7, that "presence information is not distributed to a 'user agent.'" J.A. 3014 ¶ 29. Apple responded with Forys's supplemental declaration that the SVM watcher is client-facing because (1) Vuori suggests that it is coupled to the user agent, and (2) the presence status must be distributed to a user agent because the status markers are interpretable by "programs or persons." J.A.2335–37 ¶¶ 18–19, 21. After weighing the experts' competing theories, the Board "credit[ed] Dr. Forys's testimony as being more consistent with and supported by Vuori's teachings." *Decision*, 2018 WL 2355988, at *15. Specifically, the Board found that Forys's testimony is consistent with Vuori's disclosure that "a user agent is purely coupling between a principal and some core entity of the system," such as SVM watcher 256, and we agree.

Ultimately, Uniloc's arguments on appeal amount to a request to reweigh the evidence presented to the Board. For example, Uniloc argues that "a more plausible interpretation" of Vuori's statement that presence status is interpretable by "programs or persons" is that the SVM

watcher enables an administrator, rather than a user, to access the status information.  But our task is not to determine which interpretation we find more plausible.  "[I]t is not for us to second-guess the Board's assessment of the evidence."  *Velander*, 348 F.3d at 1371.  Rather, the only question before us is whether the conclusion adopted by the Board was supported by substantial evidence.  Here, based on Vuori's disclosure that the user agents are "coupl[ed]" to the SVM watcher and that the status must be reviewable by "persons," as well as Forys's testimony that a person having ordinary skill would understand that the status information is transmitted to the user agents, we conclude that the Board's finding that a skilled artisan would understand that presence information is transmitted to the user agents via the SVM watcher was supported by substantial evidence.  Accordingly, we affirm the Board's conclusion that claims 1 and 2 would have been obvious over the prior art.

## CONCLUSION

We have considered the parties' remaining arguments but find them unpersuasive.  For the foregoing reasons, the decision of the Board is *affirmed*.

## AFFIRMED